1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SHANY CO., LTD., a Korean
     corporation,
11
                         Plaintiff,                    Civ. No. S-11-1112 KJM EFB
12              vs.

13   CRAIN WALNUT SHELLING, INC.,
     a California corporation, et al.,                 ORDER
14
                         Defendants.
15   _____/

16              Shany Co. Ltd., has filed a complaint for declaratory and injunctive relief, seeking

17   a determination whether it ever agreed to arbitrate any disputes with defendant Crain Walnut

18   Shelling, Inc.  It has filed a motion for preliminary injunctive relief, seeking narrower relief at

19   this stage of the action:  an order restraining defendant from proceeding with an arbitration with

20   the International Chamber of Commerce (ICC), which Crain claims is authorized by an

21   arbitration provision in a contract between plaintiff and defendant.  Shany claims in particular

22   that it is entitled to a judicial determination of arbitrability.  Crain has opposed the motion.  Oral

23   argument was heard on August 31, 2011, with Christopher Kim appearing for plaintiff and Paul

24   Warner appearing for defendant.  The motion was submitted following argument.  As discussed

25   below, plaintiff's motion is denied.

26   /////

                                                   1

I. <u>BACKGROUND</u>[1]

     In January 2010, Shany's Purchasing Manager Daniel Kim contacted Crain to arrange a direct purchase of walnuts; before that time, Shany had purchased Crain's walnuts through other distributors.  Declaration of Victoria Lapera, submitted in ICC proceedings (Lapera ICC Decl.) ¶¶ 5-6.  On February 2, 2010, Lapera sent an email to Kim, nominating Yoo Jong Woo to act as Crain's sales representative, but explaining that all offers, sales and documents would come directly from Crain.  *Id*. ¶ 7 & Ex. 1.

     Lapera notified Kim that by February 5, 2010, Crain would confirm the available volume for the rest of the 2009 crop year along with pricing for March shipping.  *Id*.  She included a proforma invoice for the first shipment of walnuts; this invoice does not include any contract terms.  Declaration of Kyung Up Choi (Choi Decl.) ¶ 4 & Ex. A.[2]  Shany paid for this shipment by wire transfer on March 8, 2010.  *Id*. ¶ 4.

     On March 4, 2010, Lapera emailed Kim with information about the different categories of walnut products available.  Lapera ICC Decl. ¶ 10 & Ex. 3.  She followed up on March 19, 2010 with an emailed offer, with firm pricing for the contemplated shipments.  *Id*. ¶ 11 & Ex. 4.  The offer was due to expire on March 23, 2010 and "subject to standard terms and conditions of CWS [Crain Walnut Shelling] confirmation of sale and purchase agreement."  *Id*.

/////

---

[1]  The parties have supported their positions with declarations and numerous exhibits; each has interposed evidentiary objections to the others' evidence.  For example, plaintiff objects that much of Victoria Lapera's declaration is irrelevant or hearsay, but has itself offered a declaration Lapera filed in the ICC's arbitration proceedings.  To the extent these declarations are the same, Shany has waived any objection.  Other objects will be addressed as necessary to the resolution of this motion.

[2]  Defendant objects that this portion of Choi's declaration "constitutes secondary evidence of writings which are no [*sic*] properly authenticated," and fails to identify the declarant's basis of knowledge and is speculative.  Choi describes finding this information on the laptop Kim used when he worked for Shany, which provides a sufficient basis of knowledge.  The court does not rely on the secondary evidence of the writing, but rather on the writing itself attached as an exhibit, which is authenticated by its distinctive markings.  FED. R. EVID. 901(b)(4).

2

On March 26, Kim emailed a confirmation of the second shipment with a "'stamped annual volume document,'" noting that the stamp on the document "confirm[s] you that we have the business." This document committed Shany to purchase 707,425 pounds of walnuts with a purchase price of $3,301,050.50. Lapera ICC Decl. ¶ 12 & Ex. 5. The returned document bears a stamp that appears to include the letters "SPC" in addition to some Korean characters. *Id*. Choi does not appear to dispute that Kim responded to Lapera on March 26 or even that the stamp on the "annual volume document" is Shany's, but does aver that "Shany's files contain no record of receiving an email response from Crain in response to Mr. Kim's March 26, 2010 email." *Id*.

On April 5, 2010, Kim emailed Crain, saying that Shany had cleared the first shipment of walnuts and was "ready to make next purchase," and listed what Shany wanted from the first annual volume. He continued, "Please make Proforma Invoice and sent it to us. I will get approval and send it back to you. [¶] We will do exactly like last time." (Reproduced as in original.) Choi Decl. ¶ 6 & Ex. B.

On April 6, 2010, Lapera emailed Kim and attached a one page, two sided Standard Confirmation, which included the terms of the contract for purchase. Below the signature lines are the words, "FAILURE TO SIGN AND RETURN THIS CONTRACT WITHIN SEVEN (7) DAYS, AND/OR DELIVERY OF WALNUTS CONSTITUTES BUYER'S ACCEPTANCE OF THE TERMS AND CONDITIONS SET FORTH ON THE REVERSE SIDE OF THIS CONFIRMATION OF SALE AND PURCHASE AGREEMENT ('CONTRACT')." The bottom of the form includes the phrase "ADDITIONAL TERMS AND CONDITIONS ON REVERSE SIDE." The arbitration clause was among the terms on the reverse side: "All disputes arising out of or in connection with the Contract shall be finally settled in Los Molinos California under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules." Lapera ICC

1  Decl., Ex. 6.[3]  Another term provided that the contract "shall be governed by the laws of the

2  State of California including the Uniform Commercial Code as enacted in California."  *Id*.  The

3  confirmation document is signed by Crain's representative, but not by any representative of

4  Shany's.  *Id*.  Choi avers no one from Shany signed this document or any other document on

5  behalf of Shany and that Kim was not authorized to sign it. Choi Decl. ¶ 6.  Choi does

6  acknowledge, however, that Kim "reported to [him]" about the Confirmation of Sale and

7  Purchase Agreement, which "included a page entitled 'Terms and Conditions. . . .'"  *Id*.  He

8  denies that Shany's files contain a document entitled "'Confirmation of Sale and Purchase

9  Agreement'" or 'Terms and Conditions' which contained an arbitration agreement from Crain."

10 *Id*. ¶ 5.

11              On April 22, Lapera emailed Kim with information about rebates for upcoming

12 shipments and asked about arranging a meeting between Kim and Crain during Crain's trip to

13 Korea.  Lapera ICC Decl. ¶ 14.  Kim replied with details for meeting Crain, said he would

14 discuss the incentive program with his senior management and concluded with, "I will make our

15 business firm and strong."  *Id*., Ex. 7.

16              On May 7, 2010 Lapera emailed Kim about a schedule for shipping the

17 "remaining contract balance and the best way of facilitating purchases."  *Id*. ¶ 15 & Ex. 8.

18              During the week of May 17, 2010, Crain visited Shany's restaurants and bakeries

19 in Korea and met with Kim and Choi to discuss purchase and shipping arrangements.  *Id*. ¶ 16.

20              On May 24, 2010, Lapera emailed Kim that she would continue to communicate

21 with him about "contract management," among other things.  *Id*. ¶ 17 & Ex. 9.  She sent

22 additional emails on May 26 and June 7, 2010, asking Kim to provide shipping information.  *Id*.

23  _____

24         [3] Choi's declaration describes and attaches an email from Kim to Lapera dated April 5,
    2010 in which Kim asked for a proforma invoice for the second shipment of walnuts.  Defendant
25  has objected that this merely describes a writing, which is not authenticated and is hearsay.  As
    with the earlier email, the court can determine the document's authenticity by its characteristics.
26  Although it may be hearsay, the court considers the document in resolving the issues before it.
    FED. R. EVID. 901(b)(4).

¶¶ 18-19 & Exs. 10 & 11.  Kim responded on June 8, 2010, expressing concern about the rising exchange rate and explaining that this was the reason he had not arranged the shipment.  *Id*. ¶ 20 & Ex. 12.

On June 16, 2010, Lapera emailed Kim that Crain would work with Shany, but expected performance on the contract.  *Id*. ¶ 21 & Ex. 13.

In August 2010, Kim visited Crain's headquarters and said he would be talking to his supervisors about a contract extension.  *Id*. ¶ 26.  He mentioned that Shany had purchased walnuts from other sources.  *Id*. ¶ 27.

Crain wrote to Kim on September 16, 2010, summarizing the meeting and offering to work with Shany to minimize the impact of the rising exchange rate.  *Id*. ¶ 28 & Ex. 18.  Kim confirmed he had received the letter and said he would present the letter to his director. *Id*. ¶ 29 & Ex. 19.

Despite a meeting on October 25, 2010 with Crain and Kim and another member of Shany, and a further exchange of emails, Shany did not arrange for shipment of the walnuts and Crain sold them at a loss to Costco.  *Id*. ¶¶ 33-35 & Exs. 22-25.

On February 1, 2011, Crain filed a Request for Arbitration with the ICC. Declaration of Gabriel Reynoso (Reynoso Decl.) ¶ 3 & Ex. A.  In its opposition, Shany challenged the arbitrator's authority to determine the arbitrability of the claims and alleged it never entered into an arbitration agreement.  Reynoso Decl. ¶ 6 & Ex. D.  The ICC rules allow the arbitrator to determine arbitrability.  *See* Reynoso Decl., Ex. F at 7, Art. 6.2 ("any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself.").

On March 26, 2011, Crain's counsel emailed Shany's counsel that he was unable to find anything showing that the "Terms and Conditions" were provided to Shany before March 26, 2010.  Declaration of Lisa Yang (Yang Decl.) ¶ 3.

/////

/////

On April 25, 2011, Shany filed objections and an answer to Crain's request for arbitration, challenging the ICC's jurisdiction and asserting it would seek an injunction regarding whether it was bound by the "Terms and Conditions" document.  Reynoso Decl. ¶ 17 & Ex. P.

II. <u>ANALYSIS</u>

    A.  Standards For A Preliminary Injunction

As provided by Federal Rule of Civil Procedure 65, a court may issue a preliminary injunction to preserve the relative position of the parties pending a trial on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  The party seeking injunctive relief must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Munaf v. Green*, 553 U.S. 674, 689-90 (2008).

Before the *Winter* decision, the Ninth Circuit employed a "sliding scale" or "serious question" test, which allowed a court to balance the elements of the test "so that a stronger showing of one element may offset a weaker showing of another." *See Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003).  Recently, the circuit court found that its sliding scale test survived *Winter*:  a court may issue a preliminary injunction when a plaintiff raises serious questions going to the merits and demonstrates that the balance of hardships tips sharply in his favor, so long as the court also considers the remaining two prongs of the *Winter* test. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

    B.  Arbitrability

Although the underlying declaratory judgment action raises the "broader issue of whether Shany ever agreed to arbitrate," the instant motion raises the narrower issue of whether it agreed that the arbitrator could decide the issue of arbitrability.  ECF No. 8 at 7.  It argues that if there was an agreement to arbitrate, Kim lacked the authority to bind the corporation and as no

one from Shany signed any purported agreement, the company is not bound.  It also argues that

if the company entered into a contract, the arbitration provision was a material alteration of the

terms it purportedly accepted and is therefore not binding.  ECF No. 8 at 14-15.

Crain counters that the parties entered into a contract when Kim accepted

Lapera's offer on March 26 and that contract incorporated by reference its standard terms and

conditions.  Those conditions included the arbitration clause, which in turn incorporated the rules

of the ICC, allowing the arbitrator to determine his or her own jurisdiction.  ECF No. 11 at 15-

17.  It contends that the primary case Shany relies on applies New York law, which has been

repudiated by later cases, and that arbitration clauses are commonplace in international business

deals.  Finally, it contends that Shany has waived any challenge by participating in the

arbitration.

Shany replies that silence and ambiguity cannot satisfy the requirement that any

agreement to submit the question of arbitrability to the arbitrator must be clear and unmistakable;

that plaintiff never provided its standards terms and conditions to Shany before Kim emailed

Lapera on March 26; that whatever the conditions of Lapera's offer, Kim's proposal that the

transaction be handled as before was made after Lapera's offer expired; and that the authority it

cites is still good law.

As arbitration is a matter of contract, a party cannot be required to submit to

arbitration any dispute it has not agreed is subject to this alternative means of resolving disputes.

*First Options of Chicago v. Kaplan*, 514 U.S. 938, 943 (1995); *Dream Theater, Inc. v. Dream*

*Theater*, 124 Cal.App.4th 547, 552 (2004).  The question "whether parties have agreed to

'submi[t] a particular dispute to arbitration' is typically an 'issue for judicial determination.'"

*Granite Rock Co. v. International Brotherhood of Teamsters*, ___ U.S. ___ , 130 S.Ct. 2847

(2010) (quoting *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002)); *Hartley v. Superior*

*Court*, 196 Cal.App.4th 1249, 1253 (2011).  In addition, while questions of a contract's validity

are for the arbitrator, questions about the formation of a contract, including the formation of a

1   contract containing an arbitration clause, are for the court to decide.   *Id.*; *Sanford v.*

2   *Memberworks*, 483 F.3d 956, 962 (9th Cir. 2007).

3             "The question 'who has the primary power to decide arbitrability' turns upon

4   what the parties agreed about *that* matter.  Did the parties agree to submit the arbitrability

5   question itself to arbitration?"  *First Options*, 514 U.S. at 943 (emphasis in original) (quoting *AT*

6   *& T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986)).  If parties agree

7   that the arbitrator will decide the question of arbitrability, then they must "clearly and

8   unmistakably" agree on this; "silence or ambiguity" is not sufficient.  *First Options*, 514 U.S. at

9   945; *Dream Theater*, 124 Cal.App.4th at 552.  This "clear and unmistakable" requirement

10  applies to the parties' manifestation of intent that the arbitrator should decide jurisdictional

11  questions.  *Hartley v. Superior Court*, 196 Cal.App.4th at 1254.

12            Federal substantive law governs questions of arbitrability, even in diversity cases,

13  *Moses H. Cone Memorial Hosp. v. Mercury Construction Co.*, 460 U.S. 1, 24 (1983), while state

14  law contract principles govern questions of contract formation.  *First Options*, 514 U.S. at 944;

15  *Metters v. Ralphs Grocery Co.*, 161 Cal.App.4th 696, 701 (2008) (court must find that parties

16  entered into valid contract under state law before considering federal policy favoring

17  arbitration);

18  9 U.S.C. § 2 (written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save

19  upon such grounds as exist at law or in equity for the revocation of any contract").

20            Although an arbitration agreement must be in writing, it need not be signed to be

21  enforceable if the unsigned agreement is otherwise deemed to be a contract under state law

22  principles.  *Seawright v. American Gen'l Financial Services, Inc.*, 507 F.3d 967, 978-79 & n.5

23  (6th Cir. 2007) (FAA requires only a written agreement); *Jones v. Jacobson*, 195 Cal.App.4th 1,

24  6 n.3 (2011) (unsigned agreement may be enforceable); *E.O.C. Ord, Inc. v. Kovakovich*, 200

25  Cal.App.3d 1194, 1202 (1988) (if parties accept unsigned agreement as contract, it is

26  enforceable).

In California, a contract exists when parties capable of contracting give their consent to accomplish a lawful object for sufficient consideration. CAL. CIV. CODE § 1550. The formation of a contract requires mutual consent, which in turn requires the parties to agree upon the same thing. *Bustamante v. Intuit, Inc.*, 141 Cal.App.4th 199, 207-08 (2006); CAL. CIV. CODE §§ 1550, 1565. Without a manifestation of mutual assent, there is no contract. *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 28-29 (2d Cir. 2002) (applying California law). "[M]anifestations of assent may come in multiple forms and need not take the form of a signature. Rather, contract formation merely requires a manifestation of assent by an act or omission through which a party intends to show consent." *Lincoln Gen'l Ins. Co. v. Tri Counties Bank*, No. Civ. S-10-1442 FCD/EFB, 2010 WL 3069874, at *3 (E.D. Cal. Aug 5, 2010); *Specht*, 306 F.3d at 29 ("mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract").

C.  Contract Formation In This Case

1.  Commercial Code Section 2207

Section 2207 of the California Commercial Code tracks Section 2-207 of the Uniform Commercial Code, which governs contracts between merchants who have exchanged conflicting forms. It provides:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> (a) The officer expressly limits acceptance to the terms of the offer;
>
> (b) They materially alter it; or
>
> (c) Notification of acceptance to them has already been given or is given within a reasonable time after notice of them is received.

1
2
3
4

> (3) Conduct by both parties which recognizes the existence of a
> contract is sufficient to establish a contract for sale although the
> writings of the parties do not otherwise establish a contract.  In
> such case the terms of the particular contract consist of those terms
> on which the writings of the parties agree, together with any
> supplementary terms incorporated under any other provisions of
> this code.

5    *See Textile Unlimited, Inc. v. A..BMH and Co., Inc.*, 240 F.3d 781, 787 (9th Cir. 2001); *Therma-*

6    *Coustics Mfg., Inc. v. Borden, Inc*., 167 Cal.App.3d 282, 295 (1985) (California Code provisions

7    track UCC provisions).  Under section 2207, "[i]f the parties intend to contract, but the terms of

8    their offer and acceptance differ, section 2207 authorizes a court to determine which terms are

9    part of the contract, either by reference to the parties' own dealings (see § 2207, subds. (1), (2)),

10   or by reference to other provisions of the code.  (See § 2207, subd. (3).)" *Steiner v. Mobil Oil*

11   *Corp.*, 20 Cal.3d 90, 162-63 (1977) (internal quotation omitted).  Thus, under this section, an

12   acceptance will create a contract even if the terms differ from those of the offer; if a contract is

13   formed under § 2207(1), then § 2207(2) defines the terms of the contract.  *Textile Unlimited,*

14   *Inc*., 240 F.3d at 787.

15          Shany relies on *Windsor Mills, Inc. v. Collins & Aikman Corp*., 25 Cal.App.3d

16   987 (1972), which considered whether an arbitration provision included in small print on

17   defendant's "Acknowledgment of Order" bound plaintiff to arbitration.  Shany argues that the

18   arbitration provision in *Windsor Mills* was a material alteration and so did not become part of

19   any contract.

20          In *Windsor Mills*, the court considered, among other things whether the

21   arbitration provision became part of the contract by operation of Commercial Code § 2207, and

22   concluded that "a provision for arbitration inserted in the acceptance or confirmation of an offer

23   to purchase goods 'materially alters' the offer." *Id*. at 995.  The court cites only to the

24   Comments to § 2-207 of the Uniform Commercial Code, which do not include arbitration among

25   its examples of clauses that would constitute material alterations, and to a New York case

26   holding that an arbitration clause is  a material alteration.  It does not otherwise cite to California

1   case law holding that an arbitration clause is a material alteration as a matter of law.[4]  In

2   California, as in New York, a material alteration is one that would "'result in surprise or hardship

3   if incorporated without express awareness by the other party.'"  *Steiner*, 20 Cal.3d at 102

4   (quoting comment 4, § 2207 Uniform Commercial Code).

5             Shany suggests it was surprised by the arbitration term because there was no prior

6   course of dealings that put it on notice of the arbitration provision of Crain's contract and

7   because there was no mention of it during the parties' negotiations.  It is true that parties'

8   previous transactions, which reflect exchange and acceptance of arbitration provisions, may

9   show that the party challenging the provision was not surprised by it.  Here, Shany has cited

10  nothing holding that a prior course of dealings is indispensable to rebutting a claim of surprise.

11  *See, e.g., Dixie Aluminum Products Co. v. Mitsubishi Int'l. Corp*., 785 F.Supp. 157 (N.D. Ga.

12  1992) (arbitration clause included in 16 prior order confirmations; Dixie's failure to object "does

13  not indicate unfair surprise" and so term is not material).  Moreover, Shany has cited nothing

14  saying that a failure to discuss arbitration during the course of negotiations translates into a

15  finding of surprise.  *See Marin Storage & Trucking, Inc. v. Benco Contracting and Engineering,*

16  *Inc*., 89 Cal.App.4th 1042, 1050 (2001) ("an actual negotiation regarding every term has never

17  been required for the formation of a contract," but also looking to prior course of dealing);

18  *Cohen v. Wedbush, Noble, Cooke, Inc*., 841 F.2d 282, 287 (9th Cir. 1988), *overruled on other*

19  *grounds by Ticknor v. Choice Hotels Intern., Inc*., 265 F.3d 931 (9th Cir. 2001) ("we know of no

20  case holding that parties dealing at arm's length have a duty to explain to each other the terms of

21  a written contract").

22  /////

23

24        [4]  Moreover, as Crain argues, later cases from New York have concluded that an
    arbitration provision is not a material alteration as a matter of law, but may be deemed so if the
25  party challenging it can show surprise and hardship.  *Aceros Prefabricados, S.A. v. Tradearbed,*
    *Inc*., 282 F.3d 92, 100 (2d Cir. 2002).

26

1          In addition, Crain has presented information, albeit in the form of journal articles,

2   suggesting that arbitration provisions are standard in international contracts and so Shany should

3   not have been surprised by the inclusion of such a provision.  ECF No. 11 at 22.  *Therma-*

4   *Coustics Mfg., Inc.*, 167 Cal.App.3d at 295-96 (provision customary in the industry may not be

5   material alteration); *Baywa Refining Co. v. Oxygenated Marketing and Trading A.G.*, 215 F.3d

6   219 (2d Cir. 2000) (trade custom may undercut claim of surprise).  Shany has offered nothing

7   suggesting that the inclusion of an arbitration provision runs counter to industry custom.

8          On this record, Shany has not shown a likelihood of success on the merits of its

9   claim of material alteration sufficient to support the preliminary injunction requested.

10          2.  Incorporation By Reference

11          Shany acknowledges that the contract could have been formed by Kim's March

12   26 response to Lapera's offer, but argues that because the arbitration clause was not included,

13   there is no assent to arbitrate, much less any "clear and unmistakable" agreement that the

14   arbitrator will decide questions of arbitrability.[5]  Crain responds that Lapera's email clearly

15   incorporated its standard terms and conditions by reference and that when it provided those

16   terms on April 6, Shany did not object.

17          In California, a contract may incorporate the provisions of a document that is not

18   physically part of the document executed by the parties, so long as the reference is clear and

19   unequivocal and called to the attention of the other party; the terms of the incorporated document

20   must be known or easily available to the other party.  *Newton v. American Debt Services*, No. C-

21   11-3228 EMC, 2012 WL 581318 at *5 (N.D. Cal. Feb. 22, 2012); *Shaw v. Regents of University*

22   *of California*, 58 Cal.App.4th 44, 54 (1997).  Thus, in *Wolschlager v. Fidelity Nat'l Title Ins.*

23   *Co.,* 111 Cal.App.4th 784 (2003), the court found that the defendant's preliminary title report

24

25          [5]  Shany does not press its argument that Kim's late acceptance did not serve to form a
    contract; in California, an offeror may waive a time limit in an offer and treat a late acceptance
26   as timely.  *Sabo v. Fasano*, 154 Cal.App.3d 502, 503 (1984).

sufficiently incorporated the title insurance policy and its arbitration clause by reference even

though the policy was not included with the preliminary report.  The court noted that the

preliminary report specifically identified the document it incorporated and told the recipient

where it could find the policy, which rendered the reference clear and unequivocal.  *Id*. at 791.

The court also rejected the plaintiff's argument that the defendant had any obligation to warn

plaintiff that the document incorporated by reference included an arbitration clause.  *Id*.; *see also*

*Specht*, 306 F.3d at 31 ("receipt of a physical document containing contract terms or notice

thereto is frequently deemed in the world of paper transactions, a sufficient circumstance to

place the offeree on inquiry notice of those terms").  Although Crain did not offer to provide the

terms and conditions on request, it identified the document by name, which suggests it was

easily available had Shany requested it.

Relying again on *Windsor Mills*, Shany argues it cannot be bound because the

arbitration provisions were not provided until twelve days after Kim's March 26 reply.  ECF No.

8 at 17-18.  In that case, the court found that "an offeree, regardless of apparent manifestation of

his consent, is not bound by inconspicuous contractual provisions of which he was unaware,

contained in a document whose contractual nature is not obvious."  *Windsor Mills*, 25

Cal.App.3d at 993.  The arbitration provision at issue in *Windsor Mills* appeared in small type on

the reverse of a document called "Acknowledgment of Order," which did not appear to be a

contract; in this case, in contrast, although the arbitration provision was on the back of the

document Lapera provided, that document not only appeared to be terms and conditions of a

contract but followed the earlier email notifying Shany that their agreement was subject to

Crain's standard terms and conditions.

Crain's showing undercuts the likelihood that Shany has demonstrated a

likelihood of success on the merits on the question of incorporation by reference.

/////

/////

3. Shany's Assent

The mutual assent necessary for the formation of a contract need not be demonstrated by a signature, but may be manifested by an act or omission demonstrating consent. *E.O.C. Ord, Inc. v. Kovakovich*, 200 Cal.App. 3d at 1202 (written contract formed even though other party did not sign it but rather agreed orally); *Lincoln Gen'l Ins. Co.*, 2010 WL 3069874, at *3. Nevertheless, "'silence or inaction does not constitute acceptance,'" unless "'circumstances or the previous course of dealing between the parties places the offeree under a duty to act or be bound.'" *Circuit City Stores v. Najd*, 294 F.3d 1104 (9th Cir. 2002) (quoting *Golden Eagle Ins. Co. v. Foremost Ins. Co*., 20 Cal.App.4th 1372 (1993) and *Beatty Safeway Scaffold, Inc. v. Skrable*, 180 Cal.App.2d 650 (1960)).

Crain argues Shany's acceptance was manifested by Kim's e-mail and the stamp on the "annual volume document," which Kim explained meant that Crain "had the business." It also suggests that Shany's failure to repudiate the contract when it sent confirming standard terms and conditions, and that the provision that failure to sign or repudiate the contract constituted acceptance.

Under these circumstances, when Kim arguably accepted the incorporated terms by his email of March 26, Shany's failure to sign the April 6 terms and conditions does not necessarily translate into Shany's refusal to consent to the terms, particularly when Choi acknowledges that Kim "reported to him" about Crain's terms and conditions. *Circuit City*, 294 F.3d at 1109 (when employee did not opt out of arbitration provisions that were explained to him, the import of his silence was as apparent as if he had signed the consent). This also undercuts Shany's argument that Kim lacked the authority to bind the company: Choi acknowledges that he was aware of the Terms and Conditions and yet did not object during the seven day window or at any time during the following months. Again, given the state of the record, Shany has not borne its burden of showing that its failure to sign the agreement translates into a likelihood of success on the merits.

14

4.  Clear And Unmistakable

"'[W]hen . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.'" *Greenspan v. LADT LLC*, 185 Cal.App.4th 1413 (2010) (quoting *Contec v. Remote Solution, Co*., *Ltd*., 398 F.3d 205, 208 (2d Cir. 2005)); *but see Ajamian v. CantorCO2E, L.P.*, 203 Cal.App.4th 771, 788-89 (2012) (noting split in authority on this question but ultimately not deciding it).  In this case, the ICC rules, incorporated into Crain's terms and conditions, give the arbitrator the authority to determine arbitrability.

Given this record and the state of the law, the court finds Shany has not established a likelihood of success on the merits and so has not justified the issuance of a preliminary injunction.

IT IS THEREFORE ORDERED that plaintiff's motion for the issuance of a preliminary injunction (ECF No. 8) is denied.

DATED:  May 31, 2012.

_____
UNITED STATES DISTRICT JUDGE